IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                      Case No. 3:15cr184

TREVELL MAURICE SAUL,

     Defendant.

## MEMORANDUM OPINION

On March 4, 2016, the Court granted Defendant Trevell Maurice Saul leave to file a motion to suppress. (ECF No. 20.) On March 14, 2016, Saul filed his Motion to Suppress. (ECF No. 21.) The United States filed a response in opposition. (ECF No. 22.) Saul filed a reply in support of his Motion. (ECF No. 23.) On April 27, 2016, both Saul and the United States placed supplemental filings on the record. (ECF Nos. 26, 27.) The Court held a hearing on the pending motion. After submitting evidence, the parties argued their positions. The Court took the matter under advisement. After careful review of the evidence submitted, including repeated review of the video evidence, the Court will deny the Motion to Suppress. (ECF No. 21.)

## I. Procedural Background and Findings of Fact

### A.  Procedural Background

On November 17, 2015, the grand jury returned a one-count indictment against Saul, charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C.

§ 922(g)(1).[1]  (ECF No. 1.)  Saul filed a Motion to Suppress, arguing this Court must suppress

the evidence against him because it was obtained pursuant to an unlawful pat-down in violation

of his Fourth Amendment[2] rights.  The Court held a hearing on the Motion to Suppress.  Virginia

State Trooper Matthew Reed[3] ("Trooper Reed" or "Reed") and Virginia State Trooper Joseph

Hylan[4] ("Trooper Hylan" or "Hylan") testified for the United States.  Based on the evidence and

briefing presented by the parties, the Court makes the following factual findings.

---

[1] 18 U.S.C. § 922(g)(1) states, in pertinent part:

**(g)** It shall be unlawful for any person--

> **(1)** who has been convicted in any court of, a crime punishable by
> imprisonment for a term exceeding one year

. . .
to ship or transport in interstate or foreign commerce, or possess in or affecting
commerce, any firearm or ammunition; or to receive any firearm or ammunition
which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

[2] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated, and
> no Warrants shall issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. Const. amend. IV.

[3] Trooper Reed has served as a state trooper with the Virginia State Police for four years.
Trooper Reed estimated he had conducted around 500 traffic stops prior to the stop at issue here.

[4] Trooper Hylan has served as a state trooper with the Virginia State Police for three
years.  Beyond his training to become a trooper, Hylan estimated that, at the time he participated
in the December 2014 stop, he had conducted approximately 1000 traffic stops, 100 to 150 of
which involved drugs, primarily marijuana.

### B.    Findings of Fact

Around 11:00 p.m. on December 18, 2014, Trooper Reed stopped a white Mercedes Benz for traveling 64 miles per hour in a zone with a posted speed limit of 40 miles per hour.[5]  Reed approached the car on the passenger's side, and spoke over the passenger to the driver, now known to be Saul.  Both the passenger's and driver's side windows were fully open.  Reed asked Saul for his identification, which Saul provided.  When Reed asked where Saul was going in such a hurry, Saul said that he was heading to Callao, Virginia, that he thought he was going about 50 miles per hour, and that he was giving the passenger a ride home.

Trooper Reed testified that he smelled the strong odor of marijuana upon approaching the car.  Reed stated, and the recording of the encounter confirmed, that after discussing Saul's speed for about one minute, Reed asked the occupants, "Where's the marijuana at?"  (U.S. Ex. 1, at 2:40.)  Saul denied having marijuana in the car.  Reed followed up by asking, "Okay, so if I search the car, I'm not going to find any marijuana in the car?"  (U.S. Ex. 1, at 2:50.)  Reed testified that Saul responded again that the car contained no marijuana.  Reed determined that he needed to search the car, but, given the time of night, the isolated location, and the fact that the two occupants outnumbered him, he returned to his patrol unit to radio for back up.  The video shows that, among other things, Reed called into the dispatcher a code that signified that drugs might be involved in the stop.

---

[5] Saul rightly does not challenge the initial stop of his car, nor does he suggest Reed pulled his car over for any pretextual reason.  "'When an officer observes a traffic offense—however minor—he [or she] has probable cause to stop the driver of the vehicle.'"  *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014) (quoting *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993)).  Trooper Reed observed Saul driving 64 miles per hour in a 40 miles per hour zone, a Class I misdemeanor of reckless driving in violation of Virginia Code Ann. § 46.2-878 (West 2015).

Trooper Hylan arrived at the stop in approximately ten minutes. Saul's car can be seen from Reed's dashboard camera during this wait. Both the driver's and passenger's windows remained open during the wait. Nothing suggested non-cooperative conduct by the occupants. Both officers testified that Saul generally answered politely while he was still in his car.

Upon arrival, Trooper Hylan approached Saul's side of the car, and can be heard on the video introducing himself and asking Saul if he knew why he was stopped. Saul said he was told he was speeding, but he thought he was going about 50 miles per hour. Saul's statement that he thought he was going 50 miles per hour struck Hylan as a lie, Hylan testified, because Trooper Reed told Hylan that the appropriately calibrated radar clearly showed Saul traveling at 64 miles per hour. While neither officer overemphasized its import, Reed also found Saul's response about speed unbelievable.

Saul told Hylan that he was giving his passenger a ride home because the passenger had been drinking. Saul confirmed that he was driving his mother's car, that he was from Loudon, Virginia, and that he was giving his passenger a ride home because the passenger's brother asked. When asked if Saul had anything in the car Hylan needed to know about, Saul said he had nothing. In a fast staccato, Hylan asked whether Saul or his passenger had any "drugs, knives, grenades, bombs, dead bodies; you all didn't kill your girlfriend and stick them in the back?" (U.S. Ex. 2, at 12:00.) Saul again said he was taking his passenger home and denied they had anything. Hylan told Saul he would feel safer if Saul cut the car off, which Saul did.

Hylan credibly testified that, although he did not say so to Saul, he also smelled a strong odor of marijuana emanating from the car as he approached it. Instead, Hyland said to Saul, "That trooper over there tells me he smells marijuana in the car, okay? So who's got the

4

marijuana on them?"[6] (U.S. Ex. 1, at 16:40; U.S. Ex. 2, at 12:35.) Saul said they did not have

marijuana in the car, but when prompted by Hylan to respond honestly, Saul confirmed they had

been "up at the shop" around three or four other "dudes" who had been smoking, but that they

had not smoked. (U.S. Ex. 1, at 16:45; U.S. Ex. 2, at 12:40.) Hylan said the smell might be on

their clothes and asked if Saul minded if he searched the car. Saul responded, "Yes I do mind

because, if you don't have no . . . we don't got nothing." (U.S. Ex. 1, at 17:00; U.S. Ex. 2,

at 13:00.) During the interaction, Saul repeatedly said he was just driving his passenger home.

Hylan then said, "Well, let me tell you this, okay?  In the state of Virginia, because we

smell marijuana . . . ." Saul finished his sentence: "You got the right to search the car. So, I

mean, you can search the car." (U.S. Ex. 1, at 17:10; U.S. Ex. 2, at 13:05.) Hylan told Saul to

come out of the car and said, "I'm gonna lightly pat you down, okay?" (U.S. Ex. 1, at 17:15.)

Saul said, "All right." Hylan again said he was going to pat Saul down for weapons.  Hylan

testified that while guns were less often present in stops involving marijuana, knives were a

safety concern because hunting knives, box cutters, or pocket knives were often used to slice

down the side of a store-bought cigar to replace the tobacco with marijuana, creating a "blunt."

Hylan stated that he thought he was conducting a consent search given Saul's statements.

Just seconds after Hylan told Saul to get out of the car and turn around, Hylan talked to

Saul about his hand placement.  Saul's left hand is not visible from the dash camera, but Hylan

---

[6] During the stop, Hylan's demeanor affected an officious tone, but his interaction
remained professional rather than intimidating.  This tenor changed to some degree after the gun
was found.  Without exercising force, Hylan later can be heard saying he had gotten "hyped up"
because Saul had failed to tell him about the weapon when asked.  At the same time, Saul
became less compliant, demanding a cigarette and kicking his legs and pulling down his pants in
the patrol car where, subsequently, the magazine to the gun was found on the floor.  The Court
cannot, and does not, consider any of this subsequent interaction when analyzing the decision to
pat Saul down in the first instance.

credibly testified that Saul moved his hand to his body toward his waist band. (U.S. Ex. 1, at 17:30.) The video—which Hylan had not seen prior to this hearing—confirms this. Simultaneous to Saul turning around, Hylan can be heard telling Saul not to reach for his pockets. (U.S. Ex. 1, at 17:34; U.S. Ex. 2, at 13:18.) Saul repeatedly responded, "my bad, my bad." (U.S. Ex. 1, at 17:36; U.S. Ex. 2, at 13:20.) As Trooper Hylan patted Saul down, and as he reached Saul's waistband, he felt something and asked Saul, "What is that?" Hylan identified the object he felt as a gun, retrieved it from Saul's waistband, and placed it on the back windshield of the car. (U.S. Ex. 2, at 13:33.) Trooper Hylan then handcuffed Saul and ordered Reed to place the passenger in handcuffs. Hylan told both Saul and his passenger that they were being detained for safety and were not under arrest. After checking Saul's criminal record, the officers determined that Saul was a convicted felon and placed him under arrest.

## II. Analysis

The Court will deny the Motion to Suppress. The United States bears the burden of establishing the admissibility of evidence obtained as the result of a warrantless search or seizure by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). A number of well-known exceptions to the warrant requirement exist, two of which the Court must examine in its determination of the facts at bar. First, a search pursuant to consent is a well-established exception to the warrant requirement. *Lattimore*, 87 F.3d at 650. The second exception, known as a *Terry* search pursuant to the Supreme Court of the United States' ruling in *Terry v. Ohio*, 392 U.S. 1 (1968), allows a police officer to temporarily detain a person based on specific and articulable facts, that "criminal activity may be afoot," and frisk the person for weapons based on reasonable, articulable suspicion that the person is "armed and presently

6

dangerous to the officer or to others." *Terry*, 392 U.S. at 24, 30. The Court examines these two exceptions seriatim.

A.    **The Totality of the Circumstances Does Not Show that Saul Gave Consent to Search**

The totality of circumstances demonstrate a near equal likelihood that Saul consented, or that he merely acquiesced, to the search of the car or the pat-down of his person. Thus, the United States has not met its burden of proof regarding consent. The Court will not find that Saul gave knowing, voluntary consent for the pat-down search.

1.    **Applicable Law:  Consent Searches**

When the United States asserts that a search was valid based on consent, the government must show "that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citation omitted). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968). In the analysis of whether consent was freely and voluntarily given, the Court must look to the totality of the circumstances and make a fact-based determination. *Lattimore*, 87 F.3d at 650. The Court may consider, among other facts, the "characteristics of the accused," including his or her age and experience with the criminal justice system, and the "conditions under which the consent to search was given, 'such as the officer's conduct, the number of officers present, and the duration, location, and time of the encounter.'" *Id.* (citations omitted). The Court may also look to whether the accused knew he or she had the right to refuse consent, but this factor cannot be dispositive. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *see also Schneckloth*, 412 U.S. at 231 (rejecting any proposed

7

requirement of advising a subject of his or her right to refuse consent before eliciting such consent).

### 2.  The Court Will Not Find that Saul Gave Consent

While many factors suggest it could, the Court will not rest its decision on Saul having given voluntary consent for the pat-down search. The Court finds that the facts could show that Hylan commanded Saul to get out of the car and told Saul that he would conduct a pat-down for safety.[7] Thus, in the Court's consideration of the burden of proof, the United States has failed to show under a totality of the circumstances that Saul consented, rather than merely acquiesced to, Hylan's show of authority. When an officer announces that he or she has lawful authority to conduct a search, when in fact none exists,[8] mere acquiescence to that authority does not support a finding of consent. *Bumper*, 391 U.S. at 549 (holding that "consent" to search given when an officer claims to have a warrant but does not is constitutionally invalid). Here, Saul's statement that he thought the trooper had the right to search his car, and his ambiguous response to the notice regarding a pat-down, falls close to, but just short of, meeting the government's burden to establish a consent search. Hylan's subjective belief otherwise is not determinative. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent

---

[7] Some of Saul's characteristics and the nature of the conditions under which Saul said "all right" suggest that consent may not have been a product of coercion. First, Saul, an adult, likely understood his rights. The charged offense, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), implies that Saul has some experience in the criminal justice system. *See Boone*, 245 F.3d at 362 (noting that the defendant's previous felony convictions "suggest[ed] that he was not a newcomer to the law"). Indeed, Saul knew enough to initially decline a search of his car. After that, Saul stated that he knew that the law gave the trooper the right to search the car, and told him he could search the car.

[8] The Court finds here, of course, that the officers *did* have lawful authority to conduct a pat-down of Saul. (*See infra* Part II.B.)

under the Fourth Amendment is that of 'objective' reasonableness . . . ."). The Court will thus not find that the search was lawful pursuant to Saul's consent. However, because the facts establish that Hylan's pat-down search occurred as a result of a different exception to the warrant requirement, namely, through a lawful *Terry* stop, the Motion to Suppress will be denied.

### B. The Totality of the Circumstances Justifies the Pat-Down Conducted

The totality of the circumstances supports reasonable, articulable suspicion, based on specific, articulable facts, that Trooper Hylan properly conducted a pat-down for officer safety after he and Trooper Reed smelled marijuana in the car.

#### 1. Applicable Law: *Terry* Frisks

A police officer may temporarily detain a person based on specific and articulable facts that "criminal activity may be afoot," and then frisk the person for weapons based on reasonable and articulable suspicion that the person is "armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24, 30. In deciding whether justification for a frisk exists, the court looks to the "'totality of the circumstances to determine if the officer had a particularized and objective basis for believing that the detained suspect might be armed and dangerous.'" *United States v. Robinson*, 814 F.3d 201, 206 (4th Cir. 2016) (quoting *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013)). Because the standard is an objective one, the officer's "subjective impressions are not relevant" to the analysis. *Id.* (citing *George*, 732 F.3d at 299).

#### 2. The Officers Had Reasonable, Articulable Suspicion that Saul's Vehicle Contained Marijuana

The totality of the circumstances, and particularly the smell of marijuana confirmed by two state troopers, amply supports the reasonable, articulable suspicion that Saul's vehicle contained illegal drugs. The Fourth Circuit repeatedly has held that "[a]n officer's detection of

marijuana odor [emanating from a vehicle] is sufficient to establish . . . probable cause" "to believe the vehicle contains evidence of criminal activity" and therefore provides a basis for a legal search of the vehicle. *See, e.g., United States v. Palmer*, --- F.3d ---, 2016 WL 1594793, at *6–*7 (4th Cir. Apr. 21, 2016) (citing *United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002)).[9] Here, Trooper Hylan and Trooper Reed credibly testified that they smelled the odor of marijuana emanating from the vehicle.

The Fourth Circuit does not require particular suspicion as to one occupant versus the other when officers smell marijuana inside a vehicle.[10] *See Sakyi*, 160 F.3d at 169 (noting that "when drugs are suspected in a vehicle and the suspicion is not readily attributable to any particular person in the vehicle, it is reasonable to conclude that all occupants of the vehicle are suspect"). "In the case of a search, when the [marijuana] odor emanates from a confined location such as an automobile or an apartment, . . . officers may draw the conclusion that marijuana is

---

[9] Saul contends that the mere odor of marijuana, with no other facts to suggest that the narcotic exists, cannot support reasonable, articulable suspicion. This argument is belied by numerous Fourth Circuit cases holding to the contrary. *See, e.g., Palmer*, 2016 WL 1594793, at *6–*7; *United States v. Kellam*, 568 F.3d 125 (4th Cir. 2009) (citing *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004)).

[10] Saul argued in his pre-hearing memoranda that, during an investigatory stop of three males standing in a high crime area, the smell of marijuana surrounding a *group* of individuals as opposed to a specific person cannot support reasonable, articulable suspicion particularized to a person. Saul cites an opinion from the Florida Court of Appeals. *D.H. v. State*, 121 S.3d 76, 82 (Fla. App. 2013). That Florida state court found unpersuasive testimony that a puff of smoke and the strong odor of marijuana, absent other indicia, justified a pat-down search of one member of the group.

First, as discussed above, the Fourth Circuit has found otherwise. *See United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998). Second, this non-binding authority involves a materially different factual scenario. Here, two occupants sat in a car smelling of marijuana after it had been pulled over for reckless driving by speed. Two different officers, approaching either side of the car at different times, credibly testified that they smelled a strong odor of marijuana from the car. The odor emanated from a confined space. In any event, this shows, by proximity, the connection of the odor with each occupant.

10

present in the automobile or the apartment." *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004).

Here, two separate officers smelled marijuana emanating from inside the car, even though the car windows remained open for approximately ten minutes. This alone gave reasonable, articulable suspicion that the vehicle contained illegal drugs. *Sakyi*, 160 F.3d at 169. Moreover, after initially denying marijuana presence, Saul subsequently backtracked by admitting he had earlier been near others who had smoked. While Saul was polite, a reasonable officer could conclude that Saul was, at the least, obfuscating. This behavior further supported the officers' testimony that they believed Saul's vehicle could contain marijuana. These facts led to the reasonable, articulable suspicion that criminal activity was afoot. *Terry*, 392 U.S. at 24.

### 3.    The Brief Pat-Down for Safety Was Justified Here

The totality of the circumstances, including the smell of marijuana during a traffic stop, also supports reasonable, articulable suspicion that Saul was armed and dangerous, allowing Trooper Hylan to conduct a brief pat-down for safety purposes.

The Fourth Circuit plainly has held that when an "officer has reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others." *Sakyi*, 160 F.3d. at 169. Numerous courts have confirmed the lawfulness of a limited pat-down search upon the detection of marijuana during a traffic stop. *See United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) ("[A]n officer who has reasonable suspicion to believe that a vehicle contains illegal drugs may order its occupants out of the vehicle and pat them down for weapons. Because [the police officer] detected

11

marijuana in the [vehicle], he was authorized to conduct a pat-down for weapons."); *United States v. Henderson*, 237 F. App'x 834, 837 (4th Cir. 2007) (finding pat-down constitutional when the officer frisked a suspect after he denied, but then admitted possessing marijuana, citing the "indisputable nexus between drugs and guns" that "presumptively creates a reasonable suspicion of danger to the officer").

Here, a lawful traffic stop for reckless driving had been conducted late on a December night. Two officers testified to smelling marijuana. Hylan credibly testified that he had considerable experience retrieving knives and other weapons during marijuana stops.[11] Under the facts of this case and binding Fourth Circuit precedent, Trooper Hylan had ample objectively reasonable bases to do exactly what he said he would—briefly pat down Saul for safety purposes.

Finally, Saul's heavy reliance on the Fourth Circuit decision in *United States v. Robinson*, 814 F.3d 201 (4th Cir. 2016), does not persuade. First, this Court cannot apply the aspect of the decision Saul urges it to because the Fourth Circuit granted a rehearing *en banc*, vacating the

---

[11] In a Supplemental Memorandum, in an attempt to discredit any Fourth Circuit precedent that narcotics can suggest dangerousness, Saul places before the Court certain arrest data for Northern Neck counties as reported by the Virginia State Police. (Supp'l Mem. Supp. Mot. 2–3, ECF No. 26.) Saul claims these data demonstrate that only 20 percent of "narcotics" arrests also show weapons arrests in representative Northern Neck counties. (*Id.*) The Court rejects such a conclusion.

No record of how these statistics were compiled exists. Saul admits these "crime statistics" are "fairly general." (*Id.* at 2.) They lack any showing about methodology using reliable principles and methods, reliably applied. The "narcotics" data cannot, with specificity, be tied to marijuana arrests. And this Court has no way to determine these data include instances when weapons were recovered, but not charged. Trooper Hylan testified that he often recovers knives when he finds marijuana during a traffic stop. While he stated that all the knives posed potential danger to the officers' safety, not all of the weapons were illegal, explaining some of the discrepancy between the frequency of narcotics and weapons arrests in the data presented by Saul. This Court cannot evaluate the admittedly general material. *See* Fed. R. Evid. 702.

12

panel decision. *Robinson*, No. 14-4902 (4th Cir. April 25, 2016); 4th Cir. R. 35(c).  More

pertinently, the circumstances in *Robinson* are not analogous.  There, the officers acted on an

anonymous tip that a person in a Toyota Camry leaving a high crime area was carrying a weapon

that he concealed once he entered the car.  Finding a Camry matching that description, the

officers pulled over the car after noticing that the occupants were not wearing seatbelts.  Noting

that West Virginia law did not prohibit carrying concealed weapons, the Court held that the

officers had no further facts to show that Robinson was also presently dangerous.  "Because the

carrying of a concealed firearm is not itself illegal in West Virginia, and because the

circumstances did not otherwise provide an objective basis for inferring danger, [the Court] must

conclude that the officer who frisked Robinson lacked reasonable suspicion that Robinson was

not only armed but also dangerous." *Robinson*, 814 F.3d at 204.

      Citing *Robinson*, Saul urges this court to take into account the time and context of the

behavior that poses a threat to officer safety.  (Mot. Suppress 5 n.2, ECF No. 21.)  Noting that

*Robinson* rested on newer laws that legalized carrying a concealed weapon, Saul argues that his

"traffic stop and pat down happened after several states, including Maryland, had legalized or

decriminalized all marijuana possession and numerous other states had legalized medical

marijuana possession." *Id.*  But Saul does not contend that marijuana had been legalized or

decriminalized in Virginia, where Saul was stopped.  Saul does not argue that the presence of

marijuana in his car would be legal in Virginia, nor could he.[12]  *Robinson* does not pertain,

legally or factually.

---

[12] This is true whether or not the marijuana at issue was "burnt" or "non-burnt," a
distinction these officers could not swear to following extensive, and somewhat perplexing,
questioning by defense counsel.  If the marijuana were burnt, an objective officer in Virginia

### III.  Conclusion

For the foregoing reasons, the stop and seizure of Saul fell within constitutional bounds.

Trooper Reed had probable cause to execute the traffic stop.  Troopers Hylan and Reed had

reasonable, articulable suspicion that Saul possessed illegal drugs, permitting the minimal

intrusion of a pat-down for the safety of Saul and the officers.  The Court will deny Saul's

Motion to Suppress. (ECF No. 21.)

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 6-3-16

---

could reasonably suspect that the driver might be operating the vehicle under the influence, an
illegal act. *See* Va. Code § 18.2-266.  If the marijuana were non-burnt, an objectively reasonable
officer in Virginia might conclude that the occupants knowingly (because of the smell) possessed
marijuana in the car illegally. *See* Va. Code § 18.2-250.1(A).